## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



THE NIGHTINGALE GROUP, LLC,
NIGHTINGALE PROPERTIES, LLC,
and
NIGHTINGALE REALTY, LLC,

                Plaintiffs,

v.

CW CAPITAL ASSET MANAGEMENT LLC
and
BANK OF AMERICA, N.A.,

                Defendants.

**COMPLAINT**

Civil Action No.

JURY TRIAL DEMANDED

'11 CIV 9298

JUDGE ENGELMAYER

Plaintiffs, The Nightingale Group, LLC, Nightingale Properties, LLC and Nightingale Realty, LLC, by and through their attorneys, Boies, Schiller & Flexner LLP, as for this Complaint against Defendants, CW Capital Asset Management LLC and Bank of America, N.A., allege as follows:

## PARTIES

1.    Plaintiff The Nightingale Group, LLC ("Nightingale Group") is a limited liability company organized pursuant to the laws of the State of New York with its principal office located at 1430 Broadway, New York, New York.

2.      Plaintiff Nightingale Properties, LLC ("Nightingale Properties") is a limited liability company organized pursuant to the laws of the State of New York with its principal office located at 1430 Broadway, New York, New York.

3.      Plaintiff Nightingale Realty, LLC ("Nightingale Realty") is a limited liability company organized pursuant to the laws of the State of New York with its principal office located at 1430 Broadway, New York, New York.

4.      Plaintiffs Nightingale Group, Nightingale Properties, and Nightingale Realty are among the affiliated entities that constitute the commercial real estate business commonly known as "Nightingale."

5.      Defendant CW Capital Asset Management, LLC ("CW Capital Asset Management") is a limited liability company organized pursuant to the laws of the Commonwealth of Massachusetts with its principal place of business located at One Charles River Place, 63 Kendrick Street, Needham, Massachusetts, and which may be served with process through its registered agent, Scott D. Spelfogel, at One Charles River Place, 63 Kendrick Street, Needham, Massachusetts 02494.

6.      CW Capital Asset Management is a wholly owned subsidiary of CW Financial Services LLC ("CW Financial").  CW Financial is a Delaware limited liability company with its headquarters located at One Charles River Place, 63 Kendrick Street, Needham, Massachusetts. CW Financial is a vertically integrated commercial real estate finance and investment management company focused on multifamily and healthcare lending, primary servicing, special servicing, investment management, and research and consulting services.  CW Financial is operated through four subsidiaries:  (i) CW Capital LLC (responsible for lending and primary servicing); (ii) CW Capital Asset Management (responsible for special servicing); (iii) CW

Capital Investments LLC (responsible for investment management and consulting); and
(iv) Rockwood Real Estate Advisors LLC (responsible for advisory and transactional services).

7.      The CW Financial platform has grown to comprise approximately 430 employees
in fourteen offices across the country.

8.      CW Capital Asset Management maintains an office at 555 Fifth Avenue, Fifth
Floor, New York, New York.

9.      Defendant Bank of America N.A. ("Bank of America") is a national banking
association with its principal place of business located at 100 N. Tryon Street, Charlotte, North
Carolina, which at all times herein acted as successor by merger to LaSalle Bank National
Association ("LaSalle Bank"), as Trustee for the Registered Holders of LB-UBS Commercial
Mortgage Trust 2008-C1, Commercial Mortgage Pass-Through Certificates, Series 2008-C1 (the
"Trust") and which may be served with process through its registered agent, CT Corporation, at
150 Fayetteville Street, Box 1011, Raleigh, North Carolina.

10.     Bank of America maintains an office at One Bryant Park, 115 West 42nd Street,
New York, New York.

11.     At all relevant times, Defendant CW Capital Asset Management acted as agent
for Defendant Bank of America.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this Complaint pursuant to
28 U.S.C. §§ 1331, 1367(a).

13.     Venue is proper in the Southern District of New York pursuant to 18 U.S.C.
§ 1965(a) and 28 U.S.C. § 1391(b).

## JURY DEMANDED

14.     Plaintiffs demand a jury trial of all issues triable of right by a jury pursuant to Fed. R. Civ. P. 38(b).

## FACTS

### I.     NIGHTINGALE'S BUSINESS

15.     Elchonon Schwartz and Simon Singer formed Nightingale in 2005.  Nightingale is in the business of commercial-property ownership, investment, management, and development.

16.     Through affiliated special purpose entities, and under the ownership and guidance of Messrs. Schwartz and Singer, Nightingale owns and/or manages a large and diverse commercial-property portfolio, comprised of office buildings, retail shopping and industrial centers in major markets across the eastern United States.

17.     Nightingale and each of its individual subsidiaries and affiliates, including Nightingale Group, Nightingale Properties, and Nightingale Realty, rely and depend upon Nightingale's financial reputation and industry stature to ensure success in the real estate market and to acquire additional commercial properties.

18.     Participants in the real estate business regularly subscribe to the services of data analytics firms.  These firms provide internet-based applications for loan and property surveillance, which publish, among other things, "servicing notes" submitted by loan servicers. Trepp LLC ("Trepp") and Investcap Advisors LLC ("Investcap") are two such data analytics firms.  Trepp acquired Investcap in or around March 2011.  The servicing notices published by data analytics firms such as Trepp and Investcap have an important effect upon the reputations of participants in the real estate business, and hence upon their ability to do business.  In particular,

lenders regularly consult servicing notes regarding an entity when making a decision about whether to provide financing in a transaction involving that entity or its affiliates.

## II.   CW CAPITAL ASSET MANAGEMENT'S PATTERN OF MISCONDUCT

19.    CW Capital Asset Management has on multiple occasions been appointed a "special servicer" for debts owed by Nightingale affiliates to Bank of America.

20.    As special servicer, CW Capital Asset Management has the ability to publish servicing notes regarding Nightingale, which are widely read and used by those in the real estate business, and are crucial to Nightingale's business reputation and business opportunities.

21.    CW Capital Asset Management, conducting the affairs of CW Financial and acting as agent for Bank of America, has exploited its ability to publish servicing notes regarding Nightingale, and in so doing has engaged in a pattern of misconduct with respect to Nightingale.

22.    CW Capital Asset Management has repeatedly published false and libelous servicing notes about Nightingale.  CW Capital Asset Management has published these false and libelous servicing notes via wire.  Such acts constitute wire fraud in violation of 18 U.S.C. § 1343, as well as "racketeering activity" under 18 U.S.C. § 1961(1), thereby implicating the federal Racketeering Influenced and Corrupt Organizations Act (the "RICO statute").

23.    CW Capital Asset Management has engaged in extortion, using its power to publish false and libelous servicing notes to gain leverage in its collection of debt from Nightingale, in violation of N.Y. Penal Law § 155.05 and 18 U.S.C. §§ 891(7), 894(a).  Such extortion constitutes "racketeering activity."  18 U.S.C. § 1961(1).

24.    In order to deter Nightingale from filing a meritorious libel suit as well as to induce Nightingale to agree to purchase back debt, CW Capital Asset Management made a fraudulent representation that it would publish corrective servicing notes that would rehabilitate

Nightingale's reputation, all the while never intending to abide by its agreement.  CW Capital

Asset Management's fraudulent promise was transmitted by wire, again in violation of 18 U.S.C.

§ 1343 and constituting "racketeering activity" under 18 U.S.C. § 1961(1).

26.    CW Capital Asset Management in fact breached its agreement to publish

corrective servicing notes that would rehabilitate Nightingale's reputation.

26.    CW Capital Asset Management's misconduct has interfered with Nightingale's

business opportunities, causing Nightingale substantial financial harm.

27.    CW Capital Asset Management's pattern of misconduct has extended over a

period of at least sixteen months, and threatens to continue.

28.    This action for breach of contract, tortious interference with prospective economic

advantage, fraud, and violation of the RICO statute seeks to remedy the injury that CW Capital

Asset Management has caused to Nightingale through its pattern of misconduct.

III.    **THE TENNESSEE PROPERTIES**

A.    The Tennessee Loan Documents

29.    Nightingale Realty served as property manager of four retail properties located at

228 Parkstone Place, Jackson, Tennessee; 340 Parkstone Place, Jackson, Tennessee; 1923

Emporium Drive, Jackson, Tennessee; and 1165 Vann Drive, Jackson, Tennessee (the

"Tennessee Properties").

30.    The owners of the Tennessee Properties were Nightingale-affiliated Tennessee

limited liability entities registered under the names NG 228 Parkstone, LLC; NG 340 Parkstone,

LLC; NG 1923 Emporium, LLC; and NG 1165 Vann, LLC, respectively (the "Tennessee

Owners").

31.     On or about December 15, 2007, the Tennessee Owners, as Borrower, borrowed funds from Lehman Brothers Bank, FSB (the "Lender") pursuant to a Promissory Note (the "Note") in the amount of Ten Million Five Hundred Thousand Dollars ($10,500,000).

32.     The Tennessee Owners, as Borrower, granted to the Lender a first security interest in the Tennessee Properties pursuant to a Deed of Trust, Fixture Filing and Security Agreement, dated as of December 21, 2007 (the "Deed of Trust").

33.     Messrs. Schwartz and Singer executed a Guaranty of Recourse Obligation of the Borrower, dated December 21, 2007 (the "Guaranty").

34.     In or about April 2009, Bank of America, through an Assignment, assumed the role of Lender under the Note, Deed of Trust, Guaranty, and other loan documents (the "Tennessee Loan Documents").

35.     CW Capital Asset Management has been the Special Servicer for Bank of America to service the Note, Deed of Trust, and the Tennessee Loan Documents.

36.     The recourse provisions under the Guaranty are triggered only by certain discrete and specific breaches provided for under the Deed of Trust (the "Recourse Breaches").

37.     On or about March 2, 2010, Bank of America, as Lender, through CW Capital Asset Management, as Special Servicer, sent a Notice of Default to the Borrower under the Loan and Deed of Trust, setting forth certain non-payment defaults under the Note and Deed of Trust.

38.     In the Notice of Default provided by CW Capital Asset Management and Bank of America, no identification, expressed or implied, was made concerning any Recourse Breach or any breach under Section 4.2 of the Deed of Trust.

39.     No opportunity to cure any Recourse Breach was provided to Borrowers or Messrs. Schwartz and Singer.

B.      The Tennessee Loan Action

40.     On or about May 4, 2010, CW Capital Asset Management and Bank of America filed a First Amended Complaint against the Owners-Borrower and Messrs. Schwartz and Singer, in the Chancery Court of Madison County, Tennessee, under Bank of America, N.A., et al. v. NG 1923 Emporium, LLC, et al., CV-66954/2010 (the "Tennessee Loan Action").

41.     In the Tennessee Loan Action, CW Capital Asset Management and Bank of America asserted four counts against the Tennessee Owners/Borrower:  (1) Appointment of a Receiver; (2) Temporary Restraining Order; (3) Temporary and Permanent Injunction; and (4) Breach of Contract (monetary default).

42.     In the Tennessee Loan Action, CW Capital Asset Management and Bank of America also asserted a single claim against Messrs. Schwartz and Singer for "Breach of Contract – Guaranty."

43.     On May 11, 2010, a hearing was held upon CW Capital Asset Management and Bank of America's application for Appointment of a Receiver.

44.     In their Notice of Hearing on the Application for Receiver filed in connection with the May 11, 2010, hearing, CW Capital Asset Management and Bank of America did not seek any relief against Messrs. Schwartz or Singer or any determination concerning the Guaranty.

45.     On or about May 11, 2010, CW Capital Asset Management and Bank of America submitted to the Tennessee Chancery Court a proposed Order outlining the Court's determination and appointing a receiver over the Tennessee Properties (the "Receiver Order").

46.     CW Capital Asset Management and Bank of America's proposed Receiver Order made no mention of Messrs. Schwartz or Singer, the Guaranty, any alleged Recourse Breaches, nor any liability asserted against Messrs. Schwartz or Singer under the Guaranty.

47.     To the contrary, CW Capital Asset Management and Bank of America's proposed Receiver Order stated: "The Court will reserve judgment on all matters addressed in the Complaint not expressly addressed by this Order and will address those issues at the trial of this matter or upon motion of either party."

48.     On May 11, 2010, the Court entered the Receiver Order, as drafted by CW Capital Asset Management and Bank of America and described above. The Court's Order thus made clear that the Court was reserving judgment on all matters in the Complaint apart from those expressly addressed in the Order.

## IV.   CW CAPITAL ASSET MANAGEMENT SUBMITS FALSE AND LIBELOUS SERVICING NOTES IN CONNECTION WITH THE TENNESSEE PROPERTIES

### A.   CW Capital Asset Management Publishes False and Libelous Servicing Notes.

49.     Shortly after the Court entered its Order in May 2010, CW Capital Asset Management willfully published false and libelous statements of and concerning Nightingale that were intended to, and did, damage Nightingale's reputation in the real estate market, and cause Nightingale to suffer substantial pecuniary and special damages.

50.     In complete defiance of the facts, with malice, and with no good faith basis, CW Capital Asset Management published to the real estate market in the United States in which Nightingale does business that, in addition to appointing a receiver in the Tennessee Loan Action, the Court also specifically declared that the recourse provisions of the Deed of Trust and the Guaranty had been breached and that Messrs. Schwartz and Singer were liable under the "full recourse" provisions of the Guaranty.

51.     Specifically, beginning on or about August 31, 2010, CW Capital Asset Management published five false and libelous reports, with respect to each of the four Tennessee Properties, that stated:

> On 5/11/10, the Jackson, TN Court granted our motion to appoint a receiver. **The Court also found that the Borrower had violated the SPE provisions by taking on additional and unauthorized debt by its own admission. As a result, the Court declared that the loan is now full recourse to the Guarantors.**

(Emphasis added.)

52.     CW Capital Asset Management transmitted the false and defamatory statements to publishers via wire, who in turn published them via wire.

53.     CW Capital Asset Management published similar false and defamatory statements via wire on September 15, 2010, November 15, 2010, December 15, 2010, and January 1, 2011.

54.     CW Capital Asset Management published each of these false and libelous statements as part of the servicing notes that are published periodically by a special servicer with respect to loans and other financial matters that it services.

55.     CW Capital Asset Management knew and intended that these false and libelous statements would be copied and re-published, as a matter of practice and course of conduct, in national industry publications that service, are reviewed by, and inform the real estate market, including credit agencies, banks and other financial institutions, including in such publications as Investcap, and other national reporting publications and sites.

56.     Indeed, CW Capital Asset Management, which is a Special Servicer, has a history, pattern and practice of publishing and otherwise making available to the industry notes concerning the status of the debt instruments and related borrowers and guarantors, and fully

knows that its notes are the subject of re-publication in national publications and other sites as alleged above and herein.

57.     The false and defamatory statements that CW Capital Asset Management published regarding the Tennessee Properties referred to the Guarantors under the loan, Messrs. Schwartz and Singer.

58.     These false and defamatory statements were reasonably and forseeably understood by members of the real estate community and banks and lenders as referring to Nightingale and its affiliates.

59.     These false and defamatory statements were reasonably and forseeably understood by members of the real estate community and banks and lenders as discrediting the way in which Messrs. Schwartz and Singer conduct their real estate business through Nightingale and its affiliates.

60.     In fact, and as CW Capital Asset Management knew and should have known at the time it published the false and libelous publications, the Court in the Tennessee Loan Action had not found that the Borrower had violated the SPE provisions of the Note, and the Court in the Tennessee Loan Action had not entered any Order or Judgment holding that the Borrower had violated the SPE provisions of the Note.

61.     In fact, and as CW Capital Asset Management knew and should have known at the time it published the false and libelous publications, the Court in the Tennessee Loan Action had not declared, found, held, or entered any judgment that the loan was in full recourse against Messrs. Schwartz and Singer as the Guarantors.

62.     In fact, and as CW Capital Asset Management knew and should have known at the time it published the false and libelous publications, the Court expressly stated in its Order

that it was <u>not</u> addressing the claim against Messrs. Schwartz and Singer as the Guarantors: "The Court will reserve judgment on all matters addressed in the Complaint not expressly addressed by this Order and will address those issues at the trial of this matter or upon motion of either party." Thus, in addition to misrepresenting the contents of the Order, CW Capital Asset Management published incomplete servicing notes, which omitted the foregoing material information.

63.     CW Capital Asset Management knew and should have known at the time it published the false and libelous publications that the Court in the Tennessee Loan Action had <u>not</u> found that the Borrower had violated the SPE provisions of the Note and had <u>not</u> declared that the loan was in full recourse against Messrs. Schwartz and Singer because, among other reasons, CW Capital Asset Management and Bank of America themselves had drafted the foregoing Receiver Order, which was entered by the Court, and which made no mention of any alleged Recourse Breaches and made no mention of any liability asserted against Messrs. Schwartz or Singer under the Guaranty.

64.     Indeed, in rejecting the claim of CW Capital Asset Management and Bank of America that the Chancery Court had decided against Messrs. Schwartz and Singer at the May 2010 hearing as published by CW Capital Asset Management, the Chancery Court subsequently held that the published statements were false: "[Nightingale, Mr. Schwartz, and Mr. Singer] argue that the Court made no such ruling, that this issue was not before the Court, and that it did not gain mention in the Order entered as a result of the May 11, 2010 hearing . . . . The Court agrees with [Nightingale, Mr. Schwartz, and Mr. Singer] on this point. The Court is not prepared to base a summary judgment on comments made by the Court at the hearing on May 11, 2010 which did not particularly address the details of Section 4.2."

65.     CW Capital Asset Management itself acknowledged that its statements regarding the Tennessee Properties were false in a January 14, 2011, email from the attorney for CW Capital Asset Management and Bank of America, Newlyn Inman, to Nightingale's attorney, Joshua Kahane.  Inman agreed "to provide correct information to anyone" necessary at that point in time, and noting that CW Capital Asset Management "has submitted a revised comment" to correct the libelous statement.  That representation too was false, as CW Capital Asset Management had not corrected its libelous comments at the time.

B.     CW Capital Asset Management's False and Libelous Servicing Notes
       Cause Plaintiffs Damages.

66.     CW Capital Asset Management intended and directly caused the false and libelous statements to be published and re-published and have already caused substantial and irreparable damage to Plaintiffs.

67.     As a direct and proximate consequence of the publication of false and libelous statements by CW Capital Asset Management, Nightingale was unable to conduct its business and could not enter into or close on several deals beginning in August 2010.

68.     Because of the publication of false and libelous statements by CW Capital Asset Management, banks and lenders erroneously believe that Nightingale falsified applications for financing by not acknowledging that it had been subject to an adverse judgment.

69.     As a result, these banks and lenders have refused to and will not do business with Nightingale because they believe, as a direct and proximate consequence of the publication of false and libelous statements by CW Capital Asset Management, that Nightingale and Messrs. Schwartz and Singer are dishonest and untrustworthy, which has hindered and materially prevented Nightingale from obtaining the financing necessary to continue its business.

70.     Because of CW Capital Asset Management's publication of false and libelous statements, during the period of August 2010 to July 2011, banks and lenders erroneously believed that the Chancery Court had determined that Nightingale had violated provisions of the loan agreements by taking on additional and unauthorized debt and having thus triggered the recourse provisions of the Deed of Trust and the Guaranty.  As a result, these banks and lenders did not do business with Nightingale, including because such judicial findings would have impaired the marketability of notes secured by those banks' and lenders' loans.

71.     In December 2010 and January 2011, for example, Messrs. Schwartz and Singer, on behalf of Nightingale, completed applications for financing an office building in Georgia (the "Georgia Property").  Unaware of CW Capital Asset Management's publication of the false and libelous statements, Messrs. Schwartz and Singer truthfully stated in those applications that no adverse judgments previously had been entered against themselves or Nightingale.

72.     Unbeknownst to Nightingale, however, CW Capital Asset Management had published to the real estate market, credit agencies, banks and other financial institutions that the Chancery Court in Tennessee had ruled that Messrs. Schwartz and Singer were liable under the full-recourse provision of the Guaranty.

73.     Accordingly, Nightingale was perceived as having transmitted false information to lenders in its financing applications, thereby causing significant damage to Nightingale and its affiliates' integrity and trustworthiness.

74.     As a direct and proximate consequence of CW Capital Asset Management's publication of the false and libelous statements, on or about December 28, 2010, a lender determined that it would not provide the financing for the acquisition of the Georgia Property.

75.     As a direct and proximate consequence of CW Capital Asset Management's publication of the false and libelous statements, on or about January 14, 2011, another bank advised Nightingale that it also would not provide the financing for the acquisition of the Georgia Property.  As a result, Plaintiffs suffered damages including the loss of leasing commissions, profit participations, acquisition fees, brokerage fees, annual management fees, legal and due diligence costs, and annual returns on investment.

76.     The damages directly and proximately caused by the publication of false and libelous statements by CW Capital Asset Management continue to this date and are expected to continue to cause similar and substantial monetary and special damages to Plaintiffs.  The publication of false and libelous statements by CW Capital Asset Management prevents Nightingale from conducting its usual business.

77.     As a direct and proximate consequence of the publication of false and libelous statements in connection with the Tennessee Properties by CW Capital Asset Management, Plaintiffs have been damaged by, including, but not limited to, the loss of leasing commissions, profit participations, acquisition fees, brokerage fees, annual management fees, legal and due diligence costs, and annual returns on investment.

## V.     THE PITTSBURGH PROPERTY

78.     CW Capital Asset Management continued this pattern of misconduct in connection with another Nightingale property in Pittsburgh, Pennsylvania.  Nightingale affiliate NG Riverfront, LLC had acquired a commercial property located at 810 River Avenue in Pittsburgh (the "Pittsburgh Property") with financing from Lehman Brothers Bank, FSB. Lehman Brothers Bank, FSB subsequently sold that debt to LaSalle Bank, to which entity Bank of America is successor by merger.

79.     Nightingale Realty served as property manager of the Pittsburgh Property.

80.     NG Riverfront, LLC defaulted on its loan in or about January 2009.  Bank of America appointed CW Capital Asset Management to serve as special servicer.

81.     In or about May 2009, Thomas Shearer of CW Capital contacted Mr. Schwartz and requested the balance of proceeds from rents collected.  Mr. Schwartz informed Mr. Shearer that he was prepared to provide the proceeds as requested, but that there were two significant capital issues at the property about which tenants were complaining and that should be repaired. Mr. Shearer instructed Mr. Schwartz to take care of such repairs, inasmuch as Nightingale Realty was the property manager and should do what it believed was appropriate for the tenants until a receiver was put in place.  As per CW Capital Asset Management's directive, Nightingale facilitated both repairs.

82.     CW Capital Asset Management, on behalf of Bank of America, subsequently sought to sell the debt secured by the Pittsburgh Property.

83.     In or about October 2010, Nightingale made an offer to purchase the debt, and CW Capital Asset Management reached an agreement in principal to sell the debt to Nightingale.

84.     Shortly thereafter, CW Capital Asset Management informed Nightingale that it had changed its mind and would no longer sell the debt to Nightingale.

85.     CW Capital Asset Management proceeded to try to sell the debt on the open market.

86.     Several months later, in January 2011, CW Capital Asset Management contacted Nightingale and indicated that it wished to sell the debt to Nightingale at the price agreed on in October 2010.

VI.   **CW CAPITAL ASSET MANAGEMENT SUBMITS FALSE AND LIBELOUS SERVICING NOTES IN CONNECTION WITH THE PITTSBURGH PROPERTY**

87.    CW Capital Asset Management, acting as special servicer for Bank of America, repeatedly submitted servicing notes to Trepp via wire regarding the status of the Pittsburgh Property.

88.    Repeating the pattern that had begun with the Tennessee Properties, beginning in or about May 2010, CW Capital Asset Management published two false and libelous statements in connection with the Pittsburgh Property.  First, CW Capital Asset Management falsely represented in the servicing notes that "[t]he Master Servicer [Wachovia] has attempted to implement a lockbox but the Borrower [NG Riverfront] has refused to cooperate."  Second, CW Capital Asset Management falsely represented that "The Borrower has failed to submit NCF [net cash flow]."

89.    CW Capital Asset Management knew and should have known that these statements were false when it made them.

90.    These false and defamatory statements were reasonably and forseeably understood by members of the real estate community and banks and lenders as referring to Nightingale.

91.    These false and defamatory statements were transmitted by wire to members of the real estate community and banks and lenders, who reasonably and forseeably understood them to refer to Nightingale and to discredit the way in which Messrs. Schwartz and Singer conduct their real estate business through Nightingale.

92.    CW Capital Asset Management knew and should have known that these false statements would injure Nightingale's business reputation and would make prospective business partners wary of entering into new business relationships with Nightingale.

93.     By publishing false statements that harmed Nightingale's reputation, CW Capital Asset Management gained leverage over Nightingale in CW Capital Asset Management's collection of debt on the Pittsburgh Property, as well as other debts, from Nightingale and its affiliates.

## VII.   CW CAPITAL ASSET MANAGEMENT AGREES TO SUBMIT CORRECTIVE SERVICING NOTES

94.     CW Capital Asset Management used the false statements it had published in the Trepp Report regarding Nightingale and its affiliate as a bargaining chip during negotiations regarding the Pittsburgh Property loan.

95.     CW Capital Asset Management, acting as Special Servicer for Bank of America, negotiated a Loan Sale Agreement whereby Nightingale-affiliate Commercial Enterprises was to purchase the mortgage note for the loan on the Pittsburgh Property.

96.     In the course of negotiating the Loan Sale Agreement with Mr. Singer, CW Capital Asset Management agreed to submit new servicing notes to Trepp that would help rehabilitate Nightingale's business reputation.  An e-mail from CW Capital Asset Management's counsel dated February 18, 2011, made the following representation:

> Assuming the deal closes per the agreement--we will provide the following statement "The Borrower has performed with respect to the discounted payoff as agreed" [*sic*]  Additionally and again assuming the deal closes per the agreement the servicer will not make any additional comments before or after closing.

97.     CW Capital Asset Management agreed thus to remedy the false statements it had made in the servicing notes for two purposes.  First, CW Capital Asset Management sought to induce Nightingale to enter into the Loan Sale Agreement.  Second, CW Capital Asset Management sought to induce Nightingale to refrain from timely suing CW Capital Asset Management for libel.

98.     If Nightingale had timely sued CW Capital Asset Management for libel, it would have prevailed and would have recovered damages.

99.     Nightingale requested that CW Capital Asset Management execute a side letter confirming its obligation to submit the new servicing notes as agreed.  CW Capital Asset Management insisted that the promise in the February 18 e-mail was all Nightingale needed. Specifically, Will Sledge of Mission Capital Advisers, LLC, acting as agent for CW Capital Asset Management with actual and apparent authority to bind CW Capital Asset Management, stated in an e-mail to Singer and Schwartz dated February 19, 2011, regarding the February 18 e-mail: "His email was clear.  Not sure what else you need."  In a second e-mail to Singer a few minutes later, Sledge stated:  "As we discussed it will be the servicer and it will be done at closing in the servicing notes.  No one is pulling the wool over your eyes."

100.     CW Capital Asset Management never intended to abide by its agreement.

101.     In reasonable reliance on CW Capital Asset Management's promise to submit new servicing notes, Nightingale and Messrs. Singer and Schwartz instructed Nightingale-affiliate Commercial Enterprises to execute the Loan Sale Agreement.

102.     In reasonable reliance on CW Capital Asset Management's promise to submit new servicing notes, Nightingale declined to bring a libel action against CW Capital Asset Management and Bank of America based on the false and libelous servicing notes they had published regarding the Pittsburgh Property.

103.     Shortly after the execution of the Loan Sale Agreement, Nightingale's attorney again contacted CW Capital Asset Management to confirm that it had updated the notes as per the parties' agreement.  On June 1, 2011, CW Capital responded:  "Yes the agreed upon

language has been added to the servicing notes." Unbeknownst to Nightingale, that representation was also false.

## VIII.   CW CAPITAL ASSET MANAGEMENT BREACHES ITS AGREEMENT TO SUBMIT CORRECTIVE SERVICING NOTES

104.    Having achieved its goals of inducing Nightingale to close on the Loan Sale Agreement and to forego asserting legal claims for libel, CW Capital Asset Management never entered new servicing notes.

105.    The false statements in CW Capital Asset Management's servicing notes for the Pittsburgh Property therefore remain a source of leverage that CW Capital Asset Management can use in its efforts to collect debts from Nightingale.

106.    The false statements in CW Capital Asset Management's servicing notes for the Pittsburgh Property have harmed Nightingale's reputation and have caused it to lose valuable business opportunities.

107.    In connection with the acquisition of a building to be purchased in Philadelphia, Pennsylvania (the "Philadelphia Property"), for example, Plaintiff Nightingale Realty was slated to receive a lucrative management contract. The management agreement awarding Nightingale Realty the management contract for the building had been negotiated weeks prior to the scheduled closing of the acquisition and was in final form.

108.    Days before the scheduled closing, the proposed lender for the Philadelphia Property found the servicing notes regarding the Pittsburgh Property and brought them to Nightingale's attention. The proposed lender explained that, in light of these servicing notes, it would not be possible to securitize debt with Nightingale Realty as manager.

109.    As a direct result of the proposed lender's concerns regarding the servicing notes for the Pittsburgh Property, Nightingale Realty was removed from its role as property manager

of the Philadelphia Property and replaced by another property manager in Nightingale Realty's stead.

110.    Upon learning from the proposed lender that the servicing notes had not been remedied as agreed, Mr. Singer immediately confronted CW Capital Asset Management.  As it had done earlier that year, CW Capital Asset Management again falsely represented to Nightingale that CW Capital Asset Management had updated the servicing notes regarding the Pittsburgh Property, as agreed.

111.    Because CW Capital Asset Management breached its agreement to remedy the false servicing notes in connection with the Pittsburgh Property, banks and lenders erroneously believed that Nightingale had acted improperly and in bad faith in connection with its default. As a result, these banks and lenders have refused to do business with Nightingale.  As a direct and proximate consequence of the publication of false and libelous statements by CW Capital Asset Management, Plaintiffs have been damaged by, including, but not limited to, the loss of leasing commissions, profit participations, acquisition fees, brokerage fees, annual management fees, legal and due diligence costs, and annual returns on investment.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT

112.    Plaintiffs repeat and reallege paragraphs 1-111 as if set forth herein.

113.    In order to induce Nightingale to instruct its affiliate, Commercial Enterprises, to enter in the Loan Purchase Agreement, CW Capital Asset Management, acting as agent for Bank of America, promised to submit specific new servicing notes, which if submitted would help rehabilitate Nightingale's business reputation.

114.    In consideration for and in reliance on CW Capital Asset Management's promise to submit the specific notes, Commercial Enterprises entered into the Loan Purchase Agreement.

115.   CW Capital Asset Management did not submit the new servicing notes as it had agreed.

116.   As a result of CW Capital Asset Management's breach of its agreement, Nightingale Realty lost the opportunity to enter into a management contract for the Philadelphia Property.

117.   Plaintiffs have suffered damages as a result of CW Capital's breach.

## SECOND CAUSE OF ACTION
## INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
## (INTENTIONAL)

118.   Plaintiffs repeat and reallege paragraphs 1-117 as if set forth herein.

119.   CW Capital Asset Management, acting as agent for Bank of America, submitted false and libelous servicing notes regarding Nightingale and its affiliate that injured Nightingale's business reputation.

120.   CW Capital Asset Management knew and should have known that Nightingale was engaged in the business of entering into financing deals with banks and lenders, acquiring properties with such financing, and assuming management responsibilities in connection with such deals.

121.   CW Capital Asset Management knew and should have known that its submission of false and libelous servicing notes would make prospective business partners reluctant to do business with Nightingale and would cause Nightingale to lose business.

122.   CW Capital Asset Management used its false and libelous servicing notes to gain leverage over Nightingale.

123.   In the context of negotiations over the Loan Purchase Agreement, CW Capital Asset Management promised that it would submit new servicing notes that would help

rehabilitate Nightingale's business reputation.  This promise was fraudulent because CW Capital Asset Management never intended to perform.

124.    CW Capital Asset Management never performed on its promise to submit new servicing notes that would help rehabilitate Nightingale's reputation.

125.    CW Capital Asset Management's false and libelous servicing notes forseeably have caused Nightingale to lose business opportunities, causing damages to Plaintiffs.

### THIRD CAUSE OF ACTION
### INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (NEGLIGENT – IN THE ALTERNATIVE)

126.    Plaintiffs repeat and reallege paragraphs 1-125 as if set forth herein.

127.    As special servicer for debts owed by Nightingale and its affiliates, CW Capital Asset Management had a special relationship with Nightingale.  CW Capital Asset Management's ability to submit servicing notes regarding debts owed by Nightingale and its affiliates gave it unique control over Nightingale's business relationship, placing Nightingale in a position of unique dependence on CW Capital Asset Management.

128.    CW Capital Asset Management, acting as agent for Bank of America, negligently submitted false and libelous servicing notes regarding Nightingale and its affiliates that injured Nightingale's business reputation.

129.    CW Capital Asset Management knew and should have known that Nightingale was engaged in the business of entering into financing deals with banks and lenders, acquiring properties with such financing, and assuming management responsibilities in connection with such deals.

130.    CW Capital Asset Management knew and should have known that its submission of false and libelous servicing notes would make prospective business partners reluctant to do business with Nightingale and would cause Nightingale to lose business.

131.    CW Capital Asset Management's false and libelous servicing notes forseeably have caused Nightingale to lose business opportunities, causing damages to Plaintiffs.

## FOURTH CAUSE OF ACTION
### FRAUD

132.    Plaintiffs repeat and reallege paragraphs 1-131 as if set forth herein.

133.    In or about February 2011, in order to induce Nightingale to forego asserting claims against CW Capital Asset Management and Bank of America for their publication of libelous statements in connection with the Pittsburgh Property, CW Capital Asset Management, acting as agent for Bank of America, made a forward-looking fraudulent misrepresentation that it would submit specific new servicing notes, which would help remedy the ramifications of the false notes previously submitted and rehabilitate Nightingale's business reputation.

134.    In reasonable reliance on CW Capital Asset Management's promise to submit the specific notes, Plaintiffs forewent the opportunity timely to assert claims against CW Capital Asset Management for its libelous misconduct.

135.    If Plaintiffs had timely filed suit against CW Capital Asset Management, it would have prevailed and would have recovered damages.

136.    Plaintiffs have suffered damages in the form of pecuniary loss as a result of CW Capital Asset Management's fraudulent misrepresentations.

## FIFTH CAUSE OF ACTION
## PROMISSORY ESTOPPEL

137.    Plaintiffs repeat and reallege paragraphs 1-136 as if set forth herein.

138.    In or about February 2011, in order to induce Nightingale to forego asserting claims against CW Capital Asset Management and Bank of America for their publication of libelous statements in connection with the Pittsburgh Property, CW Capital Asset Management, acting as agent for Bank of America, made a clear and unambiguous promise that it would submit specific new servicing notes, which would help remedy the ramifications of the false notes previously submitted and rehabilitate Nightingale's business reputation.

139.    In reasonable reliance on CW Capital Asset Management's promise to submit the specific notes, Plaintiffs forewent the opportunity timely to assert claims against CW Capital Asset Management for its libelous misconduct.

140.    If Plaintiffs had timely filed suit against CW Capital Asset Management, they would have prevailed and would have recovered damages.

141.    Plaintiffs have suffered damages in the form of pecuniary loss as a result of CW Capital Asset Management's failure to abide by its promise.

## SIXTH CAUSE OF ACTION
## RICO § 1962(c)

142.    Plaintiffs repeat and reallege paragraphs 1-141 as if set forth herein.

143.    CW Capital Asset Management has engaged in a pattern of fraud and extortion in its attempts to collect debts from Nightingale and its affiliates.

   a.   CW Capital Asset Management's submission of false and libelous servicing notes was wire fraud in violation of 18 U.S.C. § 1343.

    b.  CW Capital Asset Management's submission of false and libelous servicing notes was extortion in violation of N.Y. Penal Law § 155.05 and 18 U.S.C. §§ 891(7), 894(a).

    c.  CW Capital Asset Management's repeated submission of false and libelous servicing notes regarding Nightingale constitute a pattern of exploitation of CW Capital Asset Management's unique control over Nightingale's business reputation as a source of leverage in CW Capital Asset Management's efforts to collect debt from Nightingale and its affiliates.

    d.  This pattern has extended over a period of at least sixteen months, and presents an ongoing threat of criminal activity.

    e.  CW Capital Asset Management's false, libelous, or uncorrected servicing notes regarding Nightingale remain a source of leverage over Nightingale.

    f.  CW Capital Asset Management's pattern of submitting false and libelous servicing notes has put Nightingale in reasonable apprehension that CW Capital Asset Management will continue in the future to submit false and libelous servicing notes regarding Nightingale and use them as a source of leverage in collecting debt.

144.    CW Capital Asset Management engaged in its pattern of racketeering in conducting the affairs of CW Financial. CW Financial is an enterprise within the meaning of the RICO statute.

145.    In the alternative, CW Capital Asset Management engaged in this pattern of racketeering activity in conducting the affairs of the vertically integrated enterprise consisting of

CW Financial and its four subsidiaries.  CW Financial and its four subsidiaries constitute an enterprise within the meaning of the RICO statute.

146.    In the alternative, CW Capital Asset Management engaged in this pattern of racketeering activity in conducting the affairs of Bank of America.  Bank of America is an enterprise within the meaning of the RICO statute.

147.    Accordingly, CW Capital Asset Management has conducted the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

148.    As a direct result of CW Capital Asset Management's pattern of racketeering activity, Plaintiffs have suffered financial harm.

**WHEREFORE,** Plaintiffs demand as follows:

1.    That Plaintiffs be awarded a judgment against Defendants in an amount to be determined at trial, plus pre- and post-judgment interest as provided by law;

2.    That Plaintiffs be awarded a judgment against Defendant CW Capital Asset Management, equal to threefold the damages suffered by Plaintiffs, in an amount to be determined at trial, plus pre- and post-judgment interest as provided by law;

3.    That Plaintiffs be awarded a judgment against Defendants in the amount of their out-of-pocket expenses and reasonable attorneys' fees;

4.    That Plaintiffs be awarded a judgment against Defendants for punitive damages in an amount to be determined at trial;

5.    That Plaintiffs reserve the right to amend this pleading to conform with facts as they develop; and

6.      That Plaintiffs be granted such further and other relief as the Court may deem proper.

Dated:          December 19, 2011
                Armonk, New York

                                        Respectfully submitted,

                                        BOIES, SCHILLER & FLEXNER LLP

                                        By: _____

                                        Edward Normand
                                        Jason Cyrulnik
                                        333 Main Street
                                        Armonk, New York 10504
                                        T: 914.749.8200
                                        F: 914.749.8300

28