UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                :

THE NIGHTINGALE GROUP, LLC,           :
NIGHTINGALE PROPERTIES, LLC, and    :
NIGHTINGALE REALTY, LLC,         :         11 Civ. 9293 (PAE)
                                                  :
                           Plaintiffs,     :        OPINION & ORDER
                  -v-                  :
                                                  :
CW CAPITAL MANAGEMENT, LLC and    :
BANK OF AMERICA, N.A.,          :
                                                  :
                         Defendants.    :
                                                  :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

       Plaintiffs The Nightingale Group, LLC, Nightingale Properties, LLC, and Nightingale

Realty, LLC (collectively, "Nightingale") bring this claim against CW Capital Asset

Management ("CW CAM") and Bank of America, N.A. ("BOA") (collectively, "Defendants").

Nightingale claims that CW CAM, acting as an agent for BOA, made false and libelous

statements cognizable as wire fraud, as part of a pattern of racketeering activity in violation of

the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

Nightingale also asserts five state law claims: breach of contract; intentional and negligent

interference with prospective economic advantage; fraud; and promissory estoppel.  Defendants

move to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(6), for failure to

state a claim, and 9(b), for failure to plead fraudulent acts with sufficient particularity.  For the

following reasons, the Court dismisses Nightingale's RICO claim for failure to state a claim; the

Court also dismisses Nightingale's remaining state law claims for lack of subject-matter

jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1).

I.      **Background**[1]

The Nightingale entities are affiliates in a commercial real estate business based in New York City.  Compl. ¶¶ 1–4.  Operating since 2005, Nightingale is in the business of commercial property ownership, investment, management, and development.  *Id*. ¶¶ 15–16.  It owns and/or manages a diverse commercial property portfolio, comprised of office buildings, retail shopping, and industrial centers in major markets across the eastern United States.  *Id.* ¶ 16.  As a participant in the real estate market, Nightingale relies on its "financial reputation and industry stature to ensure success . . . and to acquire additional commercial properties."  *Id*. ¶ 17.

Nightingale alleges misconduct by Defendants in connection with two sets of properties—in Tennessee and in Pittsburgh, Pennsylvania.

**A.  The Tennessee Properties**

In 2007, Nightingale Realty served as the property manager for four retail properties in Tennessee (the "Tennessee Properties").  *Id*. ¶ 29.  On or about December 15, 2007, the owners of the Tennessee Properties, all Nightingale affiliated limited liability entities, borrowed funds from Lehman Brothers Bank, FSB ("Lehman Brothers").  *Id.* ¶¶ 30–31.  On or about December 21, 2007, Elchonon Schwartz ("Schwartz") and Simon Singer ("Singer"), the founders of Nightingale, executed a Guaranty of Recourse Obligation of the Borrower (the "Guaranty").  *Id*. ¶¶ 32–34.  In April 2009, BOA assumed Lehman Brothers's role as lender for the Tennessee Properties.  *Id.*  In March 2010, BOA, through the special servicer, CW CAM, sent a notice of default to the borrowers (the Nightingale-affiliated entities) claiming certain non-payment defaults under the Note and Deed of Trust.  *Id.* ¶ 37.  As Nightingale points out, CW CAM's

[1] The Court's account of the underlying facts in this case is drawn from the Complaint ("Compl."), and the exhibits attached thereto, as well as from exhibits attached to the Declaration of C. Alexander Hortis in Support of the Defendants' Motion to Dismiss ("Hortis Decl.").  On a motion to dismiss, the Court takes all facts pleaded in the Complaint as accurate.

2

notice did not claim a "Recourse Breach," *i.e.*, it did not implicate either Schwartz or Singer in the default. *See id.* ¶ 38.

A lawsuit ensued in Tennessee state court. On or about May 4, 2010, CW CAM and BOA filed an amended complaint against (1) the borrowers, (2) Schwartz, and (3) Singer in the Chancery Court of Madison County, Tennessee. They asserted four counts against the borrowers—appointment of a receiver; temporary restraining order; temporary and permanent injunction; and breach of contract—and one for breach of contract against the guarantors, Schwarz and Singer. *Id.* ¶¶ 40–42. A hearing was held May 11, 2010, at which the Chancery Court decided to appoint a receiver over the Tennessee Properties. CW CAM and BOA thereupon submitted a draft order memorializing that determination. *Id.* ¶ 45. The order did not refer to the Guaranty or suggest that Schwartz or Singer were in breach. *Id.* ¶ 46. In entering the order, the Chancery Court stated that it would "reserve judgment on all matters addressed in the Complaint not expressly addressed by [the] Order and [would] address those issues at the trial . . . or upon motion of either party." *Id.* ¶¶ 48, 62.

Beginning on or about August 31, 2010, CW CAM began publishing servicing notes containing what Nightingale claims were fraudulent statements with respect to the Tennessee Properties. *Id.* ¶ 51.[2] The notes stated:

> On 5/11/10, the Jackson, TN Court granted our motion to appoint a receiver. The Court also found that the Borrower had violated the SPE provisions by taking on

---

[2] In the real estate market, "servicing notes . . . have an important effect upon the reputations of participants in the real estate business . . . because lenders regularly consult servicing notes regarding an entity when making a decision about whether to provide financing." Compl. ¶ 18. According to the Complaint, Nightingale publishes servicing notes "via wire." *Id.* ¶ 22. The Complaint also notes that Nightingale submits servicing notes to data analytics firms, such as Trepp LLC and Advisors LLC, that in turn publish these servicing notes over the Internet. *See id.* ¶¶ 18, 87. With respect to the Tennessee Properties, the statements are alleged to have been transmitted to publishers via wire, who in turn published them via wire. *Id.* ¶ 52.

additional and unauthorized debt by its own admission. *As a result, the Court declared that the loan is now in full recourse to the Guarantors.*

*Id*. ¶ 51 (emphasis added).  Nightingale claims that CW CAM published similar statements on September 15, 2010, November 15, 2010, December 15, 2010, and January 1, 2011.  *Id.* ¶ 53.[3] Soon after, on January 14, 2011, counsel for BOA and CW CAM acknowledged that the statements were false, in an email to Nightingale's counsel, Joshua Kahane.  *Id.* ¶ 65.  The email also promised "to provide correct information to anyone" necessary, and stated that CW CAM had "submitted a revised comment" to correct the statement.  *Id.*[4]  However, the Complaint alleges, CW CAM never made any such correction.  *Id.*

B. **The Pittsburgh Property**

NG Riverfront, a Nightingale affiliate, acquired a property in Pittsburgh (the "Pittsburgh Property") with financing provided by Lehman Brothers.  Compl. ¶ 78.  BOA again assumed Lehman Brothers's role with respect to the loan, by virtue of Lehman Brothers's sale of the loan to LaSalle Bank (a BOA entity, via merger).  *Id.*  As in Tennessee, Nightingale Realty served as property manager for the Pittsburgh Property; the borrower, NG Riverfront, defaulted on its loan; and BOA appointed CW CAM as the special servicer.  *Id.* ¶¶ 79–80.

---

[3] Each servicing note, including the August one, was published "as part of the servicing notes that are published periodically by a special servicer."  Compl. ¶ 10.  Read in conjunction with Nightingale's allegation that CW CAM transmitted these statements to "publishers via wire, who in turn published them via wire," (*id.* ¶ 52), the Court understands this to mean that, on each of the dates indicated, a publisher made the above statement regarding the Tennessee Properties and that these statements had been prepared by CW CAM.

[4] The Complaint does not indicate to whom Defendants' counsel allegedly submitted this correction or when it was to be published.  *See* Compl. ¶ 65.

Nightingale alleges that, starting around May 2010, CW CAM published false servicing notes in connection with the Pittsburgh Property. *Id.* ¶ 88.[5] Nightingale alleges that CW CAM falsely stated that "[t]he Master Servicer [Wachovia] has attempted to implement a lockbox but the Borrower [NG Riverfront] has refused to cooperate." *Id.* Nightingale further alleges that CW CAM falsely represented that "[t]he Borrower has failed to submit NCF [net cash flow]." *Id.* At this point, CW CAM, on behalf of BOA, sought to sell the debt. It negotiated a Loan Sale Agreement ("LSA") whereby another Nightingale affiliate, Commercial Enterprises, was to purchase the mortgage note for the loan on the Pittsburgh Property. *Id.* ¶ 95.

Although Nightingale's rendition of events is less than clear, it appears to allege that Singer helped negotiate the sale of the debt from CW CAM to Commercial Enterprises. *Id.* ¶¶ 95–98. During the negotiation, Nightingale alleges, CW CAM promised to publish new servicing notes that would correct its earlier misstatement and rehabilitate Nightingale's reputation. This promise, Nightingale claims, was made (1) to induce Nightingale to instruct Commercial Enterprises to enter into the LSA, and, implicitly, (2) to discourage Nightingale from bringing a timely libel suit against CW CAM. *Id.* ¶ 97.[6] On February 18, 2011, CW CAM's counsel sent an email to Singer, stating:

> Assuming the deal closes per the agreement—we will provide the following statement "The Borrower has performed with respect to the discounted payoff as

---

[5] With respect to the Pittsburgh Property, Nightingale provides that CW CAM submitted the servicing notes to Trepp LLC "via wire." Compl. ¶ 87. The Court assumes that Trepp LLC in turn published these statements over the Internet.

[6] The Complaint alleges that CW CAM agreed to remedy the false statements to "induce *Nightingale* to enter into the Loan Sale Agreement." Compl. ¶ 97 (emphasis added). However, the Complaint goes on to state that, in reliance on CW CAM's promise to remedy the statements, "Nightingale and Messrs. Singer and Schwartz instructed *Nightingale-affiliate Commercial Enterprises* to execute the Loan Sale Agreement." *Id.* ¶ 101 (emphasis added). The Court's characterization of this event, above, attempts to harmonize these allegations.

agreed" [sic]  Additionally and again assuming the deal closes per the agreement the servicer will not make any additional comments before or after closing.

*Id.* ¶ 96 (correction in Complaint).  Nightingale asked CW CAM to execute a side letter to confirm that it would publish corrected servicing notes, but CW CAM responded that the promise in the February 18 email sufficed to protect Nightingale; an agent of CW CAM emailed Singer and Schwartz to state "[the previous] email was clear.  Not sure what else you need." *Id.*[7] In a second email to Singer, an agent of CW CAM similarly stated, "[as] we discussed it will be the servicer and it will be done at closing in the servicing notes.  No one is pulling the wool over your eyes." *Id.* ¶ 99.

Nightingale alleges that, in reliance on Defendants' promise to publish corrective servicing notes, it instructed Commercial Enterprises to execute the LSA and elected to forego bringing a timely libel suit against CW CAM and BOA.  *Id.* ¶¶ 101–02.[8]  Such a suit would have sought damages based on the false servicing notes CW CAM had published regarding the Pittsburgh Property.  *Id.* ¶ 102.  Soon after the LSA was executed, Nightingale asked CW CAM to confirm that it had corrected the servicing notes as it had promised.  *Id.* ¶ 103.  On June 1, 2011, CW CAM responded: "Yes the agreed upon language has been added to the servicing notes." *Id.*  However, Nightingale alleges, that representation was false.  *Id.*

---

[7] Again, the record provides no information with respect to when and where this correction was to be published.

[8] Under N.Y. C.P.L.R. § 215, an action to recover damages for "libel, slander, [and] false words causing special damages," must be commenced within one year.  N.Y. C.P.L.R. § 215(3). Because (1) the Plaintiffs have their principal offices in New York, Compl. ¶¶ 1–3; (2) CW CAM maintains an office in New York, *id.* ¶ 8; and (3) BOA maintains an office in New York, *id.* ¶ 10, New York has the greatest interest in the litigation, and New York law appears to apply. *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 350 (2d Cir. 1992) (under New York law "the law of the jurisdiction having the greatest interest in the litigation" is applicable).  Even if this were not the case, Pennsylvania law also has a one-year statute of limitations for libel suits. *See* 42 PA. CONS. STAT. § 5523(1) ("The following actions and proceedings must be commenced within one year . . . [a]n action for libel, slander or invasion of privacy.").

### C. Nightingale's Alleged Injuries

As to its injuries, Nightingale alleges that it (1) forewent a viable libel suit with respect to the Pittsburgh Property, and (2) suffered reputational harm, resulting in lost business opportunities in both Tennessee and Pittsburgh. *Id.* ¶ 106. It alleges that, in December 2010 and January 2011, as a result of CW CAM's false servicing notes regarding the Tennessee Properties, lenders declined to provide financing to Nightingale, preventing it from buying property in Georgia. *Id.* ¶¶ 73–75. It similarly alleges that CW CAM's false servicing notes regarding the Pittsburgh Property caused Nightingale to lose out on a valuable opportunity to buy a building in Philadelphia; days before the scheduled closing, the proposed lender discovered the false servicing notes and explained that, in light of them, it was unable to securitize debt with Nightingale Realty as manager. *Id.* ¶¶ 107–09. In general, Nightingale alleges that CW CAM has damaged its reputation, integrity, and trustworthiness, causing Nightingale to lose out on leasing commissions, profit participation in deals, acquisition fees, brokerage fees, annual management fees, legal and due diligence fees, and annual returns on investment. *Id.* ¶¶ 73, 77.

### D. Nightingale's Unsuccessful Libel Suits

As Defendants chronicle in a declaration accompanying their motion to dismiss, before bringing this lawsuit, Nightingale twice brought libel suits seeking damages as a result of Defendants' alleged false servicing notes. *See* Hortis Decl. Exs. 2–3.[9] On February 25, 2011, Nightingale Properties, Schwartz, and Singer brought a libel action against BOA, CW CAM, and a CW Capital executive in the Chancery Court of Madison County, Tennessee. *See* Hortis Decl. Ex. 2. It was based on CW CAM's statements about the Tennessee Property. *Id.* ¶ 35. The case

_____

[9] On a motion to dismiss, the Court may take judicial notice of court filings, including from related litigation. *See Campos v. City of New York*, No. 10-cv-493, 2010 WL 3912493, at *3 (S.D.N.Y. Sept. 13, 2010); *Ackerman v. Local Union 363*, 423 F. Supp. 2d 125, 127 (S.D.N.Y. 2006).

is still pending.[10]  On August 30, 2011, Nightingale Properties, Schwartz, and Singer brought a

parallel libel action in the Supreme Court of the State of New York against BOA, CW CAM, and

a CW Capital Executive.  Hortis Decl. Ex. 3.  The Complaint filed in the New York state action

is substantively identical to that filed in the Tennessee libel action.

### E.  Nightingale's Current Claims

On December 19, 2011, Nightingale filed this lawsuit.  It asserts five New York state law

claims and a sixth claim for civil RICO.

Nightingale's first state law claim is for breach of contract.  It alleges that CW CAM

failed to publish corrective servicing notes as promised in the February 18, 2011 email from CW

CAM's counsel to Nightingale founder Singer.  Compl. ¶¶ 112–17.[11]  As a result of this failure,

Nightingale alleges, it lost a management contract for a property in Philadelphia.  *Id*. ¶ 116.

Nightingale's second claim is for intentional interference with prospective economic advantage.

It alleges that CW CAM published false and libelous servicing notes about Nightingale in an

effort to gain leverage over it and, as a result, injured Nightingale's business reputation and

caused it to lose valuable business opportunities.  *Id*. ¶¶ 119, 122.  Nightingale's third claim is

---

[10] During oral argument, Defendants' counsel provided that, in the original case—where BOA and CW CAM brought suit against the Tennessee borrowers, Schwartz, and Singer—a motion for summary judgment against the guarantors (Schwartz and Singer) had been granted after the judge determined that "nonrecourse liability had been found."  June 14, 2012 Oral Argument Transcript ("Tr.") 20–21.  Defendants' counsel also asserted that, given the "substantial truth" defense available in defamation cases, such a determination would preclude a finding in Nightingale's favor in the Tennessee libel action.  *See id*. at 21.  *See generally* 1 Rodney A. Smolla, Law of Defamation § 5:14 (2d ed. 2012) ("Truth" will protect the defendant from liability even if the precise literal truth of the defamatory statement cannot be established.  Slight inaccuracies are tolerated; the test is whether the statement is "substantially true.").  The Court takes no position on the validity of this assertion.

[11] On its breach of contract, intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, fraud, and promissory estoppel claims, Nightingale alleges that the misconduct in question was conducted by "CW Capital Asset Management [CW CAM], acting as agent for Bank of America."  Compl. ¶¶ 113, 119, 128, 133, 138.

that CW CAM negligently interfered with Nightingale's prospective economic advantage by publishing false serving notes.  It alleges that CW CAM knew or should have known that Nightingale was engaged in the business of entering into financing deals and that the false servicing notes would cause Nightingale to lose business.  *Id.* ¶¶ 128–31.  Nightingale's fourth claim is for fraud.  It alleges that, in or about February 2011, CW CAM made a fraudulent misrepresentation that it would publish corrective servicing notes; that, in reliance on this representation, Nightingale forewent bringing a timely libel suit against CW CAM; and that, as a result, Nightingale suffered pecuniary loss.  *Id*. ¶¶ 132–36.  Nightingale's fifth claim is for promissory estoppel.  It alleges that CW CAM promised to remedy the false servicing notes with respect to the Pittsburgh Property and that, in reliance on that promise, Nightingale forewent a timely libel suit.  *Id.* ¶¶ 138–39.

Nightingale's sixth and final claim is brought under the RICO statute, 18 U.S.C. § 1962(c).  Nightingale alleges that CW CAM submitted false and libelous servicing notes, amounting to (1) wire fraud in violation of 18 U.S.C. § 1343, and (2) extortion in violation of N.Y. Penal Law § 155.05 and 18 U.S.C. §§ 891(7), 894(a).  *Id*. ¶ 143(a)–(b).  According to Nightingale, these acts constitute a pattern of racketeering activity.  The RICO claim is Nightingale's sole basis for asserting federal jurisdiction.

### F.  Defendants' Motion to Dismiss

Defendants move to dismiss the Complaint under Rules 9(b) and 12(b)(6).  They argue that Nightingale's state law claims (1) are disguised defamation claims, and thus barred by the one-year statute of limitations for such claims; and (2) for reasons particular to each claim, fail to state a claim.  Defendants also argue that Nightingale's RICO claim fails to adequately plead an "enterprise," a "pattern," or "racketeering activity," and must therefore be dismissed.

II.     **Applicable Legal Standards**

On a motion to dismiss, the Court must accept the factual allegations contained in the

complaint as true and draw all reasonable inferences in favor of the plaintiff.  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007).  The Court may look to the pleadings as well as to any

documents relied upon in the pleadings.  *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,

62 F.3d 69, 72 (2d Cir. 1995).  To survive a motion to dismiss, a plaintiff must plead sufficient

factual allegations "to state a claim for relief that is plausible on its face," *Twombly*, 550 U.S. at

570, meaning that the complaint must include "factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged," and not merely "the

unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009).  Further, "threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Id.*

In analyzing RICO claims, courts are to be mindful of Congress's goal in enacting the

statute:  "[C]ourts must attempt to achieve results 'consistent with Congress's goal of protecting

legitimate businesses from infiltration by organized crime.'"  *Allen v. New World Coffee, Inc.*,

No. 00-cv-2610, 2001 WL 293683, at *3 (S.D.N.Y. Mar. 27, 2001) (quoting *United States v.*

*Porcelli*, 865 F.2d 1352, 1362 (2d Cir. 1989)).  "Because the 'mere assertion of a RICO

claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts

should strive to flush out frivolous RICO allegations at an early stage of the litigation.'"  *Allen*,

2001 WL 293683, at *3 (quoting *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 346 (S.D.N.Y.

1998)).  In short, when examining civil RICO claims, "a court must be mindful of the

devastating effect such claims may have on defendants," and "should look with particular

scrutiny at [these] claims to ensure that the RICO statute is used for the purposes intended by

Congress." *Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC*, No. 11-cv-7801, 2012 WL 1231775, at *4 (S.D.N.Y. Apr. 12, 2012) (quoting *Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 299 (S.D.N.Y. 2011)) (internal quotation marks omitted), *reconsideration denied*, 2012 WL 1856474 (S.D.N.Y. May 22, 2012).

## III.   Discussion

### A.   Nightingale's Civil RICO Claim

Under 18 U.S.C. § 1962(c),  it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  "To establish a claim for a civil violation of section 1962(c), a plaintiff must show that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir. 1994)) (internal quotation marks omitted).

Nightingale alleges three alternative RICO enterprises, in connection with which Defendants engaged in a pattern of racketeering: (1) CW Financial; (2) a vertically integrated enterprise consisting of CW Financial and its four subsidiaries; and (3) BOA.  *Id.* ¶¶ 144–46.[12] Nightingale defines the Defendants' pattern of racketeering as entailing the "submission of false, libelous, or uncorrected servicing notes," conduct which it casts as (1) wire fraud, in violation of 18 U.S.C. § 1343, and (2) extortion in violation of N.Y. Penal Law § 155.05 and 18 U.S.C. §§

---

[12] Under RICO, an "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

891(7), 894(a).  *Id.* ¶ 143(a)–(e).  Nightingale states that these acts "extended over a period of at

least sixteen months" and "present[] an ongoing threat of criminal activity."  *Id.* ¶ 143(d).

    Although Defendants challenge the adequacy of Nightingale's pleading as to all RICO

elements, the Court need focus only on one element—that of a "pattern" of racketeering

activity—to find the RICO claim deficient.  "Under any prong of § 1962, a plaintiff in a civil

RICO suit must establish a 'pattern of racketeering activity.'"  *GICC Capital Corp. v. Tech. Fin.

Grp., Inc*., 67 F.3d 463, 465 (2d Cir. 1995).  "To survive a motion to dismiss, this pattern must

be adequately alleged in the complaint."  *Spool v. World Child Int'l Adoption Agency*, 520 F.3d

178, 183 (2d Cir. 2008).

### 1.  Requirements for a Pattern of Racketeering Activity

    A "pattern of racketeering activity" includes "at least two acts of racketeering activity,

. . . the last of which occurred within ten years . . . after the commission of a prior act of

racketeering activity."  18 U.S.C. § 1961(5).  These predicate acts, the Supreme Court has held,

must be related and either amount to, or pose a threat of, continued criminal activity.  *H.J. Inc. v.

Nw. Bell Tel. Co*., 492 U.S. 229, 239 (1989).  Therefore, to plead a pattern under RICO, a

plaintiff "must allege either an open-ended pattern of racketeering activity (*i.e.*, past criminal

conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of

racketeering activity (*i.e.*, past criminal conduct extending over a substantial period of time)."

*Cont'l Petroleum Corp.*, 2012 WL 1231775, at *7 (citing *First Capital Asset Mgmt., Inc. v.

Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004)) (internal quotation marks omitted).  A

complaint that properly alleges either a closed- or open-ended pattern satisfies the "continuity"

requirement of the pattern element.  *See Cont'l Petroleum Corp.*, 2012 WL 1231775, at *7.

### 2. Closed-Ended Continuity

Closed-ended continuity is primarily a temporal concept; however, other factors such as "'the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists.'" *Eastchester Rehab. & Health Care Ctr., LLC v. Eastchester Health Care Ctr., LLC*, No. 03-cv-7786, 2005 WL 887154, at *5 (S.D.N.Y. Apr. 15, 2005) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 321 (2d Cir. 2001); *Cofacredit*, 187 F.3d at 242). Since the 1989 decision in *H.J. Inc.*,[13] however, the Second Circuit has "never held a period of less than two years . . . constitute[s] a 'substantial period of time.'" *Spool*, 520 F.3d at 184 (quoting *Cofacredit*, 187 F.3d at 242); *see also Metromedia Co. v. Fugazy*, 983 F.2d 350, 369 (2d Cir. 1992) (finding closed-ended continuity when predicate acts occurred over a period of two years); *Jacobson v. Cooper*, 882 F.2d 717, 720 (2d Cir. 1989) (finding closed-ended continuity when predicate acts occurred over a "matter of years"); *but see Zito v. Leasecomm Corp.*, No. 02-cv-8074, 2003 WL 22251352, at *17 (S.D.N.Y. Sept. 30, 2003) (rejecting the idea that there can be *no* pattern that lasts as short as 18 months). The duration of a pattern of racketeering activity is calculated with reference to the RICO predicate acts the defendants allegedly committed. *See GICC Capital Corp.*, 67 F.3d at 467 (actions that do not constitute predicate racketeering activity not included in continuity calculation).[14]

---

[13] In *H.J. Inc.*, the Supreme Court noted that "petitioners' claim that the racketeering predicates occurred with some frequency over at least a 6–year period . . . may be sufficient to satisfy the continuity requirement." 492 U.S. at 250.

[14] Where RICO claims sound in fraud—as the RICO predicate acts do here—Rule 9(b) imposes a heightened pleading standard; it requires the complaint to: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 443–44 (S.D.N.Y. 2004). "While courts have made an exception to the particularity requirements and have allowed 'allegations [to] be

Here, Nightingale alleges that the predicate acts underlying its RICO claim span a period of "at least sixteen months."  Compl. ¶ 143.  In support of this claim, Nightingale alleges that beginning in or about May 2010, CW CAM published two false and libelous servicing notes in connection with the Pittsburgh Property, *id.* ¶ 88, and that between August 31, 2010 and January 1, 2011, CW CAM published five libelous servicing notes regarding the Tennessee Properties. *Id.* ¶¶ 51–53.  Nightingale also alleges that three emails sent by CW CAM in February 2011 were designed to induce it to refrain from bringing a timely libel suit against CW CAM.  *Id.* ¶¶ 96–99, 133.  The latest date that the Complaint recites as to any misconduct by Defendants is June 1, 2011, when CW CAM allegedly falsely represented to Nightingale that corrected servicing notes had been prepared:  "Yes the agreed upon language has been added to the servicing notes."  *Id.* ¶ 103.

The Court is left, then, with: (1) a conclusory, general claim, unsupported by specific allegations, that the predicate acts spanned "at least sixteen months," and (2) allegations of specific predicate acts that span 13 months—between May 2010 and June 2011.  However, neither Nightingale's general or specific allegations span a sufficient length of time to satisfy the Second Circuit's standards.  *See, e.g.*, *Spool*, 520 F.3d at 184 (affirming the dismissal of a RICO claim because "[a] sixteen-month period of time is insufficient to establish closed-ended continuity").

---

based on information and belief when facts are peculiarly within the opposing party's knowledge,' this exception 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations,' especially in the context of RICO claims."  *Purchase Real Estate Grp. Inc. v. Jones*, No. 05-cv-10859, 2010 WL 1837809, at *8 (S.D.N.Y. Apr. 30, 2010) (quoting *Wexner v. First Manhattan Co*., 902 F.2d 169, 172 (2d Cir. 1990)); *see also Wilson v. Toussie*, 260 F. Supp. 2d 530, 537 (E.D.N.Y. 2003) ("[I]n civil RICO actions, the concerns that dictate that fraud be pleaded with particularity exist with even greater urgency.") (internal quotation marks omitted).  For purposes of its analysis, the Court assumes *arguendo* that this standard has been met here.

With respect to Nightingale's general allegation—that predicate acts extended for "at least sixteen months"—it is insufficient to establish closed-ended continuity, because this generalized claim is not anchored in allegations as to specific acts of misconduct. *See Allen*, 2001 WL 293683, at *5 (holding that plaintiffs' conclusory allegations that the predicate acts of mail and wire fraud "over a substantial period of time" and that "defendants have engaged in such practices for several years" do not establish closed-ended continuity). This claim effectively tacks on three months to the 13-month span of the predicate acts as alleged. But the law forecloses that, because "[t]he relevant period . . . is the time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place." *Spool*, 520 F.3d at 184.

As to Nightingale's claim based on the 13-month time span of the specific predicate acts as alleged, the Court sees no reason, and Nightingale has not supplied one, to depart from the general rule that at least two years must be shown to establish a close-ended pattern. *See, e.g.*, *Cofacredit*, 187 F.3d at 242  ("Since the Supreme Court decided *H.J., Inc.*, this Court has never held a period of less than two years to constitute a 'substantial period of time.'"). Nightingale's allegations are, therefore, insufficient to establish closed-ended continuity.

### 3.   Open-Ended Continuity

A claim of open-ended continuity is shown by demonstrating past unlawful conduct coupled with a threat of future criminal conduct. *GICC Capital Corp.*, 67 F.3d at 466.  "In assessing whether or not the plaintiff has shown open-ended continuity, the nature of the RICO enterprise and of the predicate acts are relevant." *Cofacredit*, 187 F.3d at 242 (2d Cir. 1999) (citing *Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 97 (2d Cir. 1997); *GICC Capital Corp.*, 67 F.3d at 466).

In conducting this analysis, the Court is mindful of the distinction between entities (1) whose business is inherently unlawful and (2) those that primarily conduct a legitimate business:

> [Threat of continuity] is generally presumed when the enterprise's business is primarily or inherently unlawful. When the enterprise primarily conducts a legitimate business, however, no presumption of a continued threat arises. In such cases, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity.

*Spool*, 520 F.3d at 185 (internal citations and quotations omitted). Essentially, "[t]he Second Circuit has observed that inherently unlawful acts, such as murder, committed in pursuit of inherently unlawful goals, such as narcotics trafficking, are generally found to generate the requisite threat of continuity even if the time period is short, while racketeering activities furthering endeavors that are not inherently unlawful, *such as frauds in the sale of property*, are generally found wanting despite even longer periods of time." *Purchase Real Estate*, 2010 WL 1837809, at *11 (emphasis added) (citing *United States v. Aulicino*, 44 F.3d 1102, 1111–12 (2d Cir. 1995)). As the Second Circuit has further instructed, schemes that are inherently terminable are not indicative of continued criminal conduct and do not support broad findings of open-ended continuity. *See GICC Capital Corp.*, 67 F.3d at 466 ("It defies logic to suggest that a threat of continued looting activity exists when, as plaintiff admits, there is nothing left to loot.").

It is undisputed that all of the three alleged enterprises—CW Financial, CW Financial and its four subsidiaries, and BOA—primarily conduct legitimate business. *Cf. Spool*, 520 F.3d at 185 (defendants' business was primarily legitimate where defendants had "managed over one thousand successful adoptions during [a] ten-year period"). Consistent with this, Nightingale acknowledges that BOA is in the national banking business, Compl. ¶ 9, and that CW CAM is a special servicing subsidiary of CW Financial, "a commercial real estate finance and investment management company," *id.* ¶ 6.

16

The question then becomes whether Nightingale has adequately alleged that either (1) the unlawful predicate acts alleged in the Complaint are the regular way in which the Defendants conduct business or (2) the nature of the predicate acts imply a threat of continued criminal activity. *See Spool*, 520 F.3d at 185. As to the former, Nightingale does not allege, let alone with specificity, that the predicate acts are indicative of the Defendants' regular business practices. Quite the contrary: At oral argument, Nightingale's counsel conceded that there is no evidence that Nightingale's experiences with CW CAM in connection with the Tennessee Properties or the Pittsburgh Property have been replicated elsewhere. *See* Tr. 44 ("Although I guess it is true that we haven't alleged in the complaint that that they have done this with respect to other people, you can easily infer from the allegations that they've done it on the two occasions they've been our special servicer."). Nightingale, therefore, fails to satisfactorily allege that these two clusters of predicate acts are representative of the regular way in which CW CAM or BOA operate their businesses. *See Morris v. Zimmer*, No. 10-cv-4146, 2011 WL 5533339, at *11 (S.D.N.Y. Nov. 10, 2011) ("Plaintiffs do not allege facts indicating the alleged frauds perpetrated against them here are representative of the manner in which . . . defendants' company conducts business, and thus plaintiffs fail to allege an 'open-ended' pattern of racketeering activity."); *Dempsey v. Sanders*, 132 F. Supp. 2d 222, 228 (S.D.N.Y. 2001) (noting that when "[t]he alleged fraud involved was designed to extract money from the Plaintiff" and the "Plaintiff ha[d] in no way asserted that the alleged scheme is representative of the manner in which the Defendant . . . conduct[s] business . . . the Court cannot infer a threat of repeated fraud").

Nightingale does allege, conclusorily, that CW CAM's submission of false and libelous servicing notes in Tennessee and Pittsburgh has put Nightingale in reasonable apprehension that

CW CAM will continue to do so elsewhere in the future, as a means of leverage in collecting

debt from Nightingale, Compl. ¶ 143(f), and that Nightingale therefore fears "an ongoing threat

of criminal activity," *id*. ¶ 143(d).   However, Nightingale fails to supply a concrete basis on

which the Court can draw the inference that Defendants' alleged racketeering will likely

continue.[15]   The LSA for the Pittsburgh Property has been closed.   *Id.* ¶ 104.   Nightingale has not

alleged that the Defendants, in connection with any other property, have attempted or have

prepared to continue (1) releasing false servicing notes; (2) falsely promising to publish new,

corrective servicing notes; or (3) reneging on such promises.   The Court further notes that, as

alleged, this scheme played out in full only in connection with the Pittsburgh Property; as to

Tennessee, Defendants are alleged to have disseminated false servicing notes, but not otherwise

to have engaged in misconduct.   On the facts, Defendants' alleged misconduct is inherently

terminable, and Nightingale's generalized fear of reoccurrence is no more than that—a

generalized apprehension.   *See First Capital Asset Mgmt.*, 385 F.3d at 181 (affirming dismissal

of RICO claim when "the scheme has wound to a close"); *Eastchester*, 2005 WL 887154, at *6

(noting that "the scheme of fraudulently inducing a victim to purchase . . . Facilities could not

continue after the Facilities and properties were sold," and was thus inherently terminable).

Nightingale's expression of concern that if CW CAM is appointed as special servicer for

other Nightingale loans in the future, it may repeat its alleged misdeeds, does not cure this

defect.   It is, further, sheer speculation that the false servicing notes regarding the Pittsburgh

---

[15] At argument, counsel for Nightingale stated that CW CAM is a special servicer for "thousands
of outstanding loans," and argued that CW CAM is, therefore, likely to serve as Nightingale's
special servicer on some future occasion.   Tr. 42–44.   While this may support the inference that
CW CAM is likely to serve as the special servicer for Nightingale in the future, it does not
support the conclusory inference urged by Nightingale, to wit, that because "[the misconduct]
has already happened . . . it is likely to happen again."   Tr. 44.

Property will be used as "a source of leverage," Compl. ¶ 143(f), in connection with other, hypothetical properties; it is also speculative that Defendants will again disseminate false servicing notes, as allegedly occurred in connection with both sets of properties.[16]

For these reasons, "[t]he allegations here . . . differ meaningfully from other cases in which the Second Circuit has found open-ended continuity in the absence of inherently unlawful acts committed in pursuit of inherently unlawful goals." *Purchase Real Estate*, 2010 WL 1837809, at *11 (collecting cases). In *DeFalco v. Bernas*, for example, the Second Circuit found that the nature of the predicate acts committed by the defendants—an assortment of public officials, private individuals, and corporations alleged to have extorted money, real property, and personal property from the plaintiff—implied a threat of continued criminal activity, despite defendants' contention that a scheme to obtain stock and gravel was inherently finite. 244 F.3d 286, 323 (2d Cir. 2001). In *DeFalco*, notably, the plaintiff provided evidence that "even when [the plaintiff] complied with . . . defendants' threats, [the plaintiff] faced escalating demands," and at the time of filing the complaint "the defendants [were] still preventing plaintiffs from completing their development project." *Id*. at 321, 324. Nightingale makes no analogous claim here of escalating demands from CW CAM; and as noted, the Complaint is devoid of any claim that CW CAM is currently engaged in predicate acts of wire fraud or extortion.

Accordingly, the Court finds that Nightingale has failed to allege either closed- or open-ended continuity, and therefore has failed to allege a pattern of racketeering activity. The RICO claim, accordingly, must be dismissed.[17]

---

[16] Further, in the event that Defendants did issue false servicing notes at some future time, Nightingale is then fully at liberty to pursue its civil remedies for libel, this time, by filing suit on a timely basis. A timely such suit would reduce Defendants' ability to privately use the false servicing notes improperly as "leverage."

## B.   Supplemental Jurisdiction

With the RICO claim, the sole basis asserted for subject-matter jurisdiction, having been dismissed on the pleadings, the Court declines to exercise supplemental jurisdiction over the state law claims.[18]  Under 28 U.S.C. § 1367, "the district court[] may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "[T]he discretion implicit in the word 'may' in subdivision (c) of [28 U.S.C.] § 1367 permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants."  *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994).  "When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."  *Carnegie– Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (footnote omitted).  In general, "[i]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state

---

[17] Because dismissal is warranted based on Nightingale's failure to plead a pattern of racketeering activity, the Court need not address the Defendants' remaining challenges to the RICO claim.

[18] The Complaint does not allege diversity jurisdiction under 28 U.S.C. § 1332, and on the facts supplied by the parties, federal jurisdiction could not be sustained on that basis.  The requirement of complete diversity of citizenship means that no plaintiff can be a citizen of the same state as any defendant.  *See Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996).  For diversity purposes, a limited liability company is a citizen of each state of which one of its members is a citizen. *Aurora Loan Servs. LLC v. Sadek*, No. 09-cv-9651, 2011 WL 3678005, at *2 (S.D.N.Y. Aug. 22, 2011).  All three Nightingale entities and Defendant CW CAM are LLCs.  Here, both the Nightingale LLCs and CW CAM have members who are residents of New York.  *See* Declaration of Edward Normand (Dkt. 27); Updated Declaration of Christopher R. Mellot (Dkt. 25).

claims should be dismissed as well." *Castellano v. Bd. of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991) (internal quotation marks omitted).

Here, the Court has dismissed the RICO claim at the threshold, before discovery. *See First Capital Asset Mgmt.*, 385 F.3d at 183 (noting that the district court did not abuse its discretion in declining supplemental jurisdiction when done "well before trial . . . [and] even before significant discovery had taken place"). Nightingale's remaining five claims all sound in state law. Judicial economy does not support retaining jurisdiction over these claims. For these reasons, the state law claims are all dismissed without prejudice to re-filing in state court.

### C.   Leave to Amend

"When a claim is dismissed because of pleading deficiencies, the usual remedy is to permit a plaintiff to amend its complaint." *A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239, 254 (S.D.N.Y. 2004). Federal Rule of Civil Procedure 15(a) instructs that courts "should freely give leave [to amend a complaint] when justice so requires." However, "[a] district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200–01 (2d Cir. 2007). Amendment is futile if an amended complaint would fail to state a claim on which relief could be granted. *See Troung v. Am. Bible Soc'y*, 171 F. App'x 898, 898–99 (2d Cir. 2006) (summ. order). Stated otherwise, "[w]here it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (per curiam); *see also Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990) ("[W]here, as here, there is no merit in the proposed amendments, leave to amend should be denied."). Finally, relevant here, leave to amend a complaint is appropriately denied "'when the new claim could have been raised

earlier.'"  *Berman v. Parco*, 986 F. Supp. 195, 217 (S.D.N.Y. 1997) (quoting 1 M. Silberberg,

*Civil Practice in the Southern District of New York* § 6.26).

   In this case, there is good cause to deny leave to amend.  Nightingale had a known

opportunity to amend, so as to cure the defects Defendants had identified in the RICO claim, but

chose to forego it.  This Court's Individual Rules & Practices in Civil Cases provide:

> When a motion to dismiss is filed, the non-moving party must, within ten days of
> receipt of the motion, notify the Court and its adversary in writing whether (1) it
> intends to file an amended pleading and when it will do so, or (2) it will rely on
> the pleading being attacked. If the non-moving party elects not to amend its
> complaint, no further opportunities to amend will be granted and the motion to
> dismiss will proceed in the regular course.

Judge Paul A. Engelmayer's Individual Rules and Practices in Civil Cases, Rule 3.F, *available at*

http://www.nysd.uscourts.gov/cases/show.php?db=judge_info & id=568.  Nightingale did not

supply any such notice in this case; instead, it elected to rely on the pleading being attacked.  At

oral argument, the Court inquired of Nightingale's counsel whether he had reviewed the Court's

individual practices and whether he had made a deliberate decision, after receiving the motion to

dismiss, thereupon to defend the original Complaint rather than amend it.  Nightingale's counsel

confirmed that he had read the Court's rules, and had made a deliberate decision not to amend.

Counsel explained that Nightingale believed the Complaint did not need to be remedied.  *See* Tr.

24.

   When the "[p]laintiff has not filed an amended complaint . . . and has committed the

amendment to the Court's discretion . . . he has waived his right to amend as a matter of course."

*Quitt v. City Univ. of New York*, No. 09-cv-4026, 2009 WL 4059209, at *2 (S.D.N.Y. Nov. 20,

2009).  Courts in this district "'may deny a motion to amend when the movant knew or should

have known of the facts upon which the amendment is based when the original pleading was

filed, particularly when the movant offers no excuse for the delay.'"  *Berman*, 986 F. Supp. at

217 (quoting 1 M. Silberberg, *Civil Practice in the Southern District of New York* § 6.26); *cf.*
*Bay Harbour Mgmt., LLC v. Carothers*, 474 F. Supp. 2d 501, 503 (S.D.N.Y. 2007); *Tyco Labs.,*
*Inc. v. Cutler-Hammer, Inc.*, 490 F. Supp. 1, 3 (S.D.N.Y. 1980) (denying motion to amend where
"plaintiffs could have moved to amend and supplement their complaint in the manner proposed
long before now and . . . granting plaintiffs' motion at this time would not serve the interests of
justice").

Moreover, under the circumstances here, amendment would be futile.  As noted, the
underlying Complaint makes clear that the events relating to the Tennessee and Pittsburgh
properties did not span a sufficient time to support a finding of a closed-ended RICO "pattern."
*See Feldman Law Grp. P.C. v. Liberty Mut. Ins. Co.*, 819 F. Supp. 2d 247, 263 (S.D.N.Y. 2011)
(denying amendment "[b]ecause the . . . [u]nderlying Complaint provide[d] enough facts for the
Court to determine that . . . [plaintiff] cannot state a breach-of-contract claim . . . [and]
amendment to that part of the Complaint would be futile"), *aff'd*, No. 11-4483-cv, 2012 WL
1323966 (2d Cir. Apr. 18, 2012) (slip op.).  Nightingale has further acknowledged that it knows
of no other examples of misconduct on the part of CW CAM, other than that directed at
Nightingale with respect to those two properties.  Indeed, Nightingale's counsel acknowledged
that "any amendment . . . would be nothing more than the inferences that one can reasonably
draw from the allegations of the complaint."  Tr. 24.  Under these circumstances, the Court
concludes that any amendment would be futile.

For these reasons, the Court grants the motion to dismiss the RICO claim with prejudice
and without leave to amend.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint is hereby GRANTED.  Nightingale's RICO claim is dismissed with prejudice.  The Court declines to exercise supplemental jurisdiction over the plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(c)(3) and, therefore, the state law claims are dismissed without prejudice to re-filing in state court.  The Clerk of the Court is directed to terminate the motion at docket number 10, and to close the case.

      SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: July 5, 2012
      New York, New York

24